### BYRNE v. KANSAS CITY, FT. S. & M. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit.   April 3, 1894.)

#### No. 138.

1. NEGLIGENCE—SERVANT NOT UNDER CONTROL OF MASTER.
   A railroad company is not responsible for negligence in the operation of an engine, when, at the time of the accident, the engine and the crew by which it was operated were rented to and under the control of another company.

2. SAME—TRAIN CROSSING HORSE-CAR LINE.
   The requirement (Code Tenn. Mill. & V. § 1304) that the trains on one railway shall come to a full stop before crossing the line of another railway has no application to the crossing by a steam commercial railway of an ordinary horse-car line.

3. SAME—PEDESTRIAN ON TRACK.
   A railroad company is not responsible for an accident (Code Tenn. Mill. & V. § 1298, subsec. 4) when the person injured appeared upon the road so short a time before he was struck that it was impossible to sound the alarm whistle, put down the brakes, and use any other means than those which were used to stop the train.

4. CONTRIBUTORY NEGLIGENCE—MITIGATION OF DAMAGES.
   A right of action (Code Tenn. Mill. & V. §§ 1298–1300) founded on a failure to ring the bell of a locomotive at short intervals on leaving a city *held* not barred by the contributory negligence of the person injured, but same must be considered by the jury in mitigation of damages. Railroad Co. v. Acuff, 20 S. W. 348, 92 Tenn. 26, followed.

5. FEDERAL COURT—CONSTRUCTION OF STATE STATUTE.
   A rule that contributory negligence shall not be a complete bar to a statutory action for negligence (Code Tenn. Mill. & V. §§ 1298–1300) is binding upon a federal court when such rule grows out of the language of the statute, and the construction of that language by the supreme court of the state.

In Error to the Circuit Court of the United States for the Western District of Tennessee.

This was a writ of error from the circuit court of the United States for the western district of Tennessee, sued out by the plaintiff below, Francis J. Byrne, administrator of George Nason, deceased. The action was brought for the wrongful death of the plaintiff's intestate against the Kansas City, Ft. Scott & Memphis Railroad

Company and the Kansas City & Memphis Railway & Bridge Company.    55 Fed. 44.

The amended declaration averred that plaintiff's intestate was run over and killed by a train of the defendant the Kansas City, Ft. Scott & Memphis Railroad Company, running on the track of the Kansas City & Memphis Railway & Bridge Company, at a place where it crosses Pennsylvania avenue, a street of the city of Memphis. That the death was caused by the negligence of the defendants in not keeping the crossing at Pennsylvania avenue in good repair, as the bridge company had agreed with the city of Memphis to do; in not keeping the bell of the engine constantly ringing while said engine was passing through the city; in not keeping a lookout ahead; in not sounding the alarm whistle; and in not putting down the brakes to stop the engine before Nason was struck,—all in violation of the laws of Tennessee. Further wrongful conduct was averred in that the engine did not come to a full stop before crossing the street railroad which was being operated on Pennsylvania avenue, in violation, as charged, of the statutes of the state.

The facts developed by the evidence were as follows: Pennsylvania avenue runs north and south. The bridge company owns a track of about 2½ miles, connecting the bridge with the railways which run into Memphis. The track runs east and west, and crosses Pennsylvania avenue at right angles. From the east side of Pennsylvania avenue it curves rather abruptly to the south, the curve being about 10 feet in 100 from a straight line. The bridge company owns no engines of its own, but it rented the one in question from the Kansas City, Ft. Scott & Memphis Railroad Company. The accident occurred upon Sunday, June 26, 1892, about 6 o'clock in the evening, in broad daylight. The engine was running west, on business of the bridge company, with its tender in front. It was a switch engine, and, as is generally the case in such engines, the tender slopes downward towards the back. Coal had been piled up on the tender so as to somewhat obstruct the view of the engineer. There was a flagman at the Pennsylvania crossing at the time of the accident. Nason, the deceased, was a colored man, 86 years of age. A few minutes before the accident he had crossed the track, and entered into conversation with the flagman and a boy about 12 years of age, who was sitting there with the flagman. In the course of the conversation he expressed a desire to die; said that he was not happy, and that if he did die he could not be in a worse place than he was then. The flagman's house was at the southeast corner of the crossing. Nason, who lived in a house at the northwest corner of the crossing, about 30 feet from the track, started towards his home. There was a double railway track on the crossing. The engine was backing down on the north track. The flagman saw the engine, and put out his red signal, and then discovered Nason walking towards the track, and called out to him. So also did the young boy who was with the flagman. As the locomotive ran onto Pennsylvania avenue, Nason was on the south track. Without halting he walked onto the north track immediately in front of the engine. Before stepping on the track, he turned his head to look either at the engine or at those who were shouting at him. He was run down, and thrown some 20 or 30 feet beyond the west line of Pennsylvania avenue. Two witnesses of the plaintiff swear that they were sitting within 30 or 40 feet of the crossing, and that the engine bell did not ring. The engineer and the fireman upon the engine, and the flagman and the boy who was at the crossing, all swear that the bell did ring. The engineer testified that the whistle had been blown about a block away from the Pennsylvania crossing. The engine did not stop before it crossed the street-car track. The engineer did not see the man until he was about to step upon the track, 10 feet away from the tender. He then reversed his engine, and did everything he could to stop, but was unable to prevent the accident. The trial judge first directed a verdict for the railway company on the ground that it was not responsible for the negligence of the engineer and fireman, because at the time of the accident they were rented with the engine to the bridge company. After full argument he also directed a verdict for the bridge company on the ground that, while the bridge company was negligent in certain respects, the accident was also due to the gross negligence of the deceased, which barred recovery.

Francis J. Byrne, in pro. per.

E. F. Adams and C. H. Trimble (Wallace Pratt, of counsel), for defendants in error.

Before TAFT and LURTON, Circuit Judges, and BARR, District Judge.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The first question for our consideration is whether the contract by which the Kansas City Company rented its engine to the bridge company relieves it of responsibility for negligence in the operation of the engine while in the service of the bridge company. It appears from the statement of Nettleton, who was both the superintendent of the bridge company and of the terminals of the Kansas City Railroad Company at Memphis, that the bridge company rented the engine from the railway company at $10 a day, and also paid the railway company the expense of the fuel and supplies used in the running of the engine, and the wages of the engineer and fireman, who were carried on the pay rolls of the railway company. The bridge is used by several different railway companies. The switch engine pushes all trains over it, and thus gives assistance to the regular engines of the railway companies on the heavy grades of the approaches. The engineer and fireman were subject to the orders of Nettleton as superintendent of the bridge company. As he expressed it, the bridge company rented the crew, along with the engine, from the railway company.

On this state of facts we are clearly of the opinion that the court was right in holding that the railway company was not responsible for the acts of the engineer and fireman in running the engine which killed Nason. They were, it is true, general servants of the railway company, but at the time of the accident they were engaged in the work of the bridge company, were subject to the orders of the bridge company's officers, and in what they did or failed to do were acting for the bridge company. The question is one of agency. The result is determined by the answer to the further questions, whose work was the servant doing? and under whose control was he doing it? The railway company had simply lent its general servants to become special or particular servants of the bridge company, had for the time parted with control over them, and was not responsible for their acts while in the service and under the control of their temporary master.

The latest authority in support of this conclusion is Donovan v. Construction Syndicate, a decision by the court of appeals of England, reported in 1 Q. B. [1893] 629. In that case the defendants contracted to lend to a firm, who were engaged in loading a ship at their wharf, a crane, with a man in charge of it. He received directions from the firm or their servants as to the working of the crane, and the defendants had no control in the matter. The plaintiff, who was a servant of the wharfingers, was struck by the crane, and injured, by reason of the negligence of the man in charge of

it, and sued the defendants on the ground that the negligence was the act of their servant. It was held that, though the man in charge of the crane remained the general servant of the defendants, yet, as they had parted with the power of controlling him in the work in which he was engaged, they were not liable for his negligence while so employed. Judgments were delivered in this case by Lord Esher, Master of the Rolls, and Lindley and Bowen, Lord Justices.

Lord Esher said:

"In this case the crane and the man to work it were lent by the defendants to Jones & Co. for a consideration, and to be used in the manner I have described. For some purposes, no doubt, the man was the servant of the defendants. Probably, if he had let the crane get out of order by his neglect, and, in consequence, any one was injured thereby, the defendants might be liable; but the accident in this case did not happen from that cause, but from the manner of working the crane. The man was bound to work the crane according to the orders, and under the entire and absolute control, of Jones & Co. That being so, whose servant was the man in charge of the crane as to the working of it? It is true that the defendants selected the man and paid his wages, and these are circumstances which, if nothing else intervened, would be strong to show that he was the servant of the defendants. So, indeed, he was as to a great many things; but as to the working of the crane he was no longer their servant, but bound to work under the orders of Jones & Co.; and, if they saw the man misconducting himself in working the crane, or disobeying their orders, they would have a right to discharge him from that employment. This conclusion hardly requires authority, but there is authority for it, without going back to an earlier date, in the case of Rourke v. Colliery Co., 2 C. P. Div. 205."

Lindley, Lord Justice, said:

"The key to the whole case is that Jones & Co. were loading the ship, and not the defendants. The crane was being used for Jones & Co.'s purposes, and not for those of the defendants, and the former must, for that particular job, be considered as Wand's [the man in charge of the crane] masters."

Lord Justice Bowen said:

"The law on the matter now before us seems to me to be perfectly clear. The question is not who procured the doing of the unlawful act, but depends on the doctrine of the liability of a master for the acts of his servant done in the course of his employment. We have only to consider in whose employment the man was at the time when the acts complained of were done in this sense: that by the employer is meant the persons who had a right at the moment to control the doing of the act. That was the test laid down by Crompton, J., nearly forty years ago, in Sadler v. Henlock, 4 El. & Bl. 570, in the form of the question, 'Did the defendants retain the power of controlling the work?' Here the defendants certainly parted with some control over the man, and the question arises whether they parted with the power of controlling the operation on which the man was engaged. There are two ways in which a contractor may employ his men and his machines. He may contract to do the work, and, the end being prescribed, the means of arriving at it may be left to him; or he may contract in a different manner, and, not doing the work himself, may place his servants and plant under the control of another,—that is, he may lend them,—and in that case he does not retain control over the work.  *  *  *  In the present case the defendants parted for a time with control over the work of the man in charge of the crane, and their responsibility for his acts ceased for a time."

In Rourke v. Colliery Co., 2 C. P. Div. 205, the defendants, the owners of the colliery, had begun to sink a pit or shaft, and had

erected and employed men to drive a steam engine near its mouth. After doing some work on the shaft, they entered into an agreement with one Whittle to carry on the work for them; Whittle to find all the labor necessary, and the defendants to provide and place at his disposal and under his control the necessary engine power, ropes, etc., with the engineer, who was paid by the defendants. The plaintiff, who was one of the men employed and paid by Whittle, while working at the bottom of the shaft, was injured by the negligence of the engineer. It was held by the court of appeals, consisting of Chief Justice Cockburn, Lord Justice Mellish, and Baggallay and Bramwell, Justices of Appeal, that, though the engineer was the general servant of the defendants, yet, because he was under the orders and control of Whittle at the time of the accident, he was at that time the servant of Whittle, and not of the defendants, who were, therefore, not liable for his negligence.

The same view was taken by the supreme court of Tennessee in the case of Powell v. Construction Co., 88 Tenn. 692, 13 S. W. 691. in which Judge Lurton delivered an elaborate opinion for the court. In that case the construction company undertook to build a railroad from Memphis to Jackson, and sublet to a subcontractor the laying of part of the track. The construction company agreed to furnish push cars, locomotive, flats, and engineer and fireman and one brakeman, to be used and controlled by the subcontractor in doing this work. The inference from the contract was that the engineer, fireman, and brakeman were to be paid by the construction company. The plaintiff was injured by reason of the negligence of the fireman furnished by the construction company in running the engine. It was held that in so doing the fireman, though paid by the construction company, was the servant of the subcontractor, and that the construction company could not be held liable for his negligence. Judge Lurton quotes with approval, from Chief Justice Cockburn's judgment in Rourke v. Colliery Co., this language:

"When one person lends his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him."

In Miller v. Railroad Co., 76 Iowa, 655, 39 N. W. 188, a contractor agreed to lay defendant's track at the rate of a certain number of miles per month, defendant "to furnish the motive power and cars, and operate the construction trains." One of the contractor's employes was killed by the too rapid running of the construction train. It was held that the defendant railway company was not liable, because, from the nature and terms of the contract, it did not have control of the construction trains, though the trainmen were retained on its pay roll, and received their wages from it.

In Railroad Co. v. Norwood, 62 Miss. 565, a different view of the law was taken. There a railroad company employed M., a contractor, to do certain work upon its road, and paid him therefor a stipulated price, and furnished him a construction train, and engineer to run the same. Subject to certain regulations as to speed,

the control, management, and direction of the construction train was given wholly to the contractor. The engineer was selected by the company, and it alone had the right to discharge him, though bound to do so upon the complaint of M., and to supply his place. The company paid the engineer's wages, and charged the same to M., and deducted the amount thereof from the sum due him for his work. The railroad company was held liable to the owner of a mule killed by the negligent running of the construction train. The conclusion of the court was made to rest on what are known as the Carriage Cases,—Laugher v. Pointer, 5 Barn. & C. 547, and Quarman v. Burnett, 6 Mees. & W. 499. The supreme court of Texas, in Burton v. Railroad Co., 61 Tex. 526, reached the same conclusion on the same authorities. These Carriage Cases were clearly distinguished from the case at bar and like cases by Lord Justice Bowen in Donovan v. Construction Syndicate, ubi supra, in the following language:

"The principal part of the argument for the plaintiff was founded on what may be called the Carriage Cases,—Laugher v. Pointer, and Quarman v. Burnett,—but they really have nothing to do with the point presented in this appeal. If a man lets out a carriage on hire to another, he in no sense places the coachman under the control of the hirer, except that the latter may indicate the destination to which he wishes to be driven. The coachman does not become the servant of the person he is driving, and, if the coachman acts wrongfully, the hirer can only complain to the owner of the carriage. If the hirer actively interferes with the driving, and an injury occurs to any one, the hirer may be liable, not as the master, but as the procurer and cause of the wrongful act complained of. In the present case the defendants parted for a time with control over the work of the man in charge of the crane and their responsibility for his acts ceased for the time."

This explanation of the Carriage Cases is also clearly stated by Mr. Justice Field in Little v. Hackett, 116 U. S. 366, 372, 380, 6 Sup. Ct. 391. It is manifest, therefore, that they have no application whenever it appears that the master has parted to another for a time with control over his servant, to be used in the work of that other.

We think that the weight of reason and authority is in favor of the ruling of the learned judge below, and the judgment for the Kansas City, Ft. Scott & Memphis Railroad Company is affirmed.

The second question is whether the bridge company was obliged to stop its engine before crossing the street-railway track upon Pennsylvania avenue, under section 1304 of the Code of Tennessee. That section provides that every engine or train shall be brought to a full stop before crossing a railroad which intersects the road upon which it runs. If a stop was required by the statute in this case, it might be argued that the deceased had the right to rely on its doing so; and therefore that he was not negligent in crossing the track without looking for a train or locomotive, or, at least, that the question was one for the jury. The court below was of the opinion that section 1304 did require the engine to stop before crossing a street railway. We are unable to concur in this view. The evidence is that this was a street railway, from which we infer, in the absence of evidence to the contrary, that it was a horse rail-

way.  It has been decided by the supreme court of Tennessee in Katzenberger v. Lawo, 90 Tenn. 235, 16 S. W. 611, that:

"A dummy line, over which trains are drawn by a small steam engine for transportation of passengers only, whether operated within or without the limits of a municipality, is a railroad, within the meaning of the statutes prescribing certain precautions for prevention of accidents on railroads."

And it was held that it did not affect the application of those statutes that the dummy was running longitudinally upon the streets of the city, for the very cogent reason that under such circumstances the danger of accidents is obviously increased.  The decision just cited was based upon that in the case of Railway Co. v. Doyle, 88 Tenn. 747, 13 S. W. 936, in which it was held that a dummy railroad, constructed by authority upon a public road or street, and operated for the transportation of passengers only, by means of a steam engine and coaches, constituted an additional burden upon the ultimate fee in the road or street, for which the owner of that fee was entitled to compensation as for the taking of his property for a public use.  In the latter case the supreme court of the state expressly distinguish between a dummy railroad operated by steam and an ordinary street railroad, the motive power of which is horses, and classify the dummy railroad with commercial railways, and differentiate it from an ordinary horse-car line. It follows, therefore, that the statute of Tennessee, which requires that the trains on one railway shall come to a full stop before crossing the line of another railway, has no application to the crossing by a steam commercial railway of an ordinary horse-car line.

The third question in the case is whether there was such contributory negligence on the part of the deceased as to bar his recovery in this action.  We fully concur with the learned trial judge in the view that there was conclusive evidence of the grossest negligence on Nason's part, by reason of which he stepped to his death.  Indeed, there are some circumstances tending to show that his death was voluntary, but they are not of that conclusive character which would justify a court in predicating a peremptory charge thereon.  Were this a suit for common-law negligence alone, there is no doubt that the action of the court in taking this case from the jury and directing a verdict for the bridge company would have to be affirmed.  But the difficulty in the case arises from certain statutory requirements affecting the operation of railways in Tennessee, the construction of which, by the supreme court of that state, gives them a peculiar effect in actions for damages for personal injury.  Those statutes are contained in section 1298 et seq. of Mill. & V. Code.

Section 1298:  In order to prevent accidents upon railroads, the following precautions shall be observed:

1st.  The overseers of every public road, crossed by a railroad, shall place at each crossing a sign, marked: "Look out for the cars when you hear the whistle or bell," and the county court shall appropriate money to defray the expenses of said signs; and no engine driver shall be compelled to blow the whistle or ring the bell at any crossing, unless it is so designated.

2nd.  On approaching every crossing so distinguished the whistle or bell of

the locomotive shall be sounded at the distance of one-fourth of a mile from the crossing, and at short intervals, till the train has passed the crossing.

3rd. On approaching a city or town, the bell or whistle shall be sounded when the train is at the distance of one mile, and at short intervals till it reaches its depot or station; and on leaving a town or city, the bell or whistle shall be sounded when the train starts and at intervals till it has left the corporate limits.

4th. Every railroad company shall keep the engineer, fireman or some other person upon the locomotive always upon the lookout ahead; and when any person, animal or other obstruction appears upon the road, the alarm-whistle shall be sounded, the brakes put down and every possible means employed to stop the train and prevent an accident.

Section 1299: Every railroad company that fails to observe these precautions, or cause them to be observed by its agents and servants, shall be responsible for all damages to persons or property, occasioned by or resulting from any accident or collision that may occur.

Section 1300: No railroad company that observes or causes to be observed these precautions, shall be responsible for any damages done to persons or property on its road. The proof that it has observed said precautions shall be upon the company.

The learned judge held that the fourth subsection of section 1298, above quoted, did not apply to this case, because Nason appeared upon the road so short a time before he was struck that it was impossible to sound the alarm whistle, put down the brakes, and use any other means than were used to stop the train. We concur in this view. It is quite true that there was evidence to show that the engineer and the fireman were prevented from having a full lookout ahead by reason of the coal upon the tender, but it also appears that the engineer saw Nason before he stepped upon the track, or within striking distance of it. Until Nason did so, subsection 4 did not apply. When he did so, it was impossible for the engineer to do anything other than to reverse his engine and attempt to stop it. If the engineer had been on the lookout ahead as he came on to the crossing, without any obstruction by any of the coal in the tender, he would have seen nothing except Nason walking towards the track. In Railway Co. v. Howard, 90 Tenn. 144–149, 19 S. W. 116, it was held that the engineer of a railroad was not guilty of violating the statute if he failed to take steps to stop his train whenever a wagon was seen approaching its track. It was held that it was only when the obstruction appeared on the track, or within striking distance of it, that the statute imposed the requirement of putting on the brakes, reversing the engine, etc. In the case of Railroad Co. v. Reidmond, 11 Lea, 205, it was held that to constitute an obstruction within the meaning of this statute, prescribing the duties of the railroad company when a person, animal, or other obstruction appears upon the road, the animal must be in a position to be struck or directly injured by the engine while moving on the rails, and that the statute does not apply when the animal or person appears on some other part of the company's right of way, but that the duty and liability of the company in such a case are regulated by the principles of the common law.

Under the third subsection, the bearing of which upon this case does not seem to have engaged the attention of the learned trial

judge, there is much more difficulty in supporting the peremptory charge for the defendant. This engine was leaving the city of Memphis. Subsection 3 requires that when a train is leaving a city the bell or whistle shall be sounded when the train starts, and at intervals until it has left the corporate limits. By reference to the first paragraph of the subsection, "at intervals" has been construed by the supreme court of the state to mean "short intervals." Railroad Co. v. Gardner, 1 Lea, 688-690. Now, there was positive evidence from three witnesses, who were near enough to hear the bell if it did ring, that it did not ring as the crossing was approached. The preponderance of the evidence was that the bell did ring all the time. But there was a conflict of evidence. There was evidence, therefore, tending to show that the precautions enjoined upon railroad companies in subsection 3 of the statute were not observed, and the question which remains to be considered is whether a right of action founded on such failure to observe precautions is barred by the contributory negligence of the injured person. If the decisions of the supreme court of Tennessee are controlling in this forum upon this point, then there can be no doubt that contributory negligence is not a bar to the action under section 1299 for failure to comply with any of the subsections of section 1298, and that the court below erred in taking the case from the jury. The last expression of the supreme court of Tennessee is to be found in the case of Railroad Co. v. Acuff (decided in 1893) 92 Tenn. 26, 20 S. W. 348. That was a suit against the railroad company for the failure to observe the fourth subsection of 1298. The deceased, for whose killing the plaintiff brought the action, was a deaf and dumb man, who was run down by a construction train. The court below was requested to charge the jury as follows:

"If the jury shall find that the deceased was deaf and dumb, and shall further find that on the morning of the killing he was warned of unusual danger from walking the track, by reason of the irregular running of a construction train, or for any other cause, and advised to take the dirt road, and still deceased, regardless of the warning, chose to walk on the railroad track, knowing that he could hear no signal, this would be such negligence as would bar recovery, and you should so find."

The court refused to give this instruction because counsel asked that it be applied to both counts of the declaration. Said Judge Caldwell, speaking for the supreme court:

"The reason given sustains the action of the court. The declaration contained two counts,—one for negligence at common law, and the other for failure to observe statutory precautions for prevention of accidents when obstructions appear upon the track. Contributory negligence might have defeated the common-law action, but not that based upon the statute. As to the latter, it could be considered only in mitigation of damages."

The same rule has been laid down in a great number of cases, where the actions were founded on a failure to observe the statutory precautions in cases described in subsections 2, 3, and 4 of section 1298. Railroad Co. v. Wilson, 90 Tenn. 271, 16 S. W. 613; Railway Co. v. Howard, 90 Tenn. 144, 19 S. W. 116; Patton v. Railway Co., 89 Tenn. 370, 15 S. W. 919; Railroad Co. v. Foster, 88 Tenn.

672, 13 S. W. 694, and 14 S. W. 428; Railroad Co. v. Smith, 9 Lea, 474; Railroad Co. v. Scales, 2 Lea, 688; Railroad Co. v. Gardner, 1 Lea, 691; Railroad Co. v. Nowlin, Id. 523; Railroad Co. v. Walker, 11 Heisk. 383; Hill v. Railroad Co., 9 Heisk. 823; Railroad Co. v. Smith, 6 Heisk. 174; Railroad Co. v. Conner, 2 Baxt. 382; Railroad Co. v. Burke, 6 Cold. 45.

The last-named case was decided in 1869, and by an unbroken line of authorities the rule as above stated has been enforced from that time down to the latest utterance of the court in 1893. The case of Railway Co. v. Howard, supra, was quite like the one at bar. There the deceased was driving a wagon across the track at a road crossing within the corporate limits of the town of Paris. The proof showed that all the statutory precautions were observed, and every possible means employed, by the company to prevent the accident, with a single exception, to wit, that it did not appear that the bell or whistle was sounded at short intervals continuously throughout the last mile before reaching the depot. The deceased was said to have been guilty of gross contributory negligence in failing to look and listen for approaching trains before driving upon the track; but the railway company was nevertheless held liable in damages for killing the deceased, the jury being required to consider deceased's contributory negligence in mitigation of damages.

The question whether we are bound by the decision of the supreme court of Tennessee as to the effect of contributory negligence in statutory actions depends on the basis given by that court for its conclusion. If the statute is held to be merely declaratory of the common law both in its requirements and in the liability imposed for failure to observe it, and the plea of contributory negligence is allowed only in mitigation of damages, because, in the view of the supreme court of Tennessee, that is the only effect it could have in an action for common-law negligence, we conceive that the effect of contributory negligence in such a case would be a question of general common law, with respect to which we might exercise an independent judgment. But if the rule of the state supreme court grows out of the peculiar liability imposed by the statute as distinguished from that imposed for negligence at common law, then it is the legitimate effect of a construction of a state statute by the highest tribunal of the state, and we are, of course, bound by it. That the rule as to contributory negligence in statutory actions is not the result of an assimilation of common-law principles to statutory negligence is most clearly brought out in Railroad Co. v. Acuff, 92 Tenn. 26, 20 S. W. 348, above cited. There it will be seen that the court held that a certain state of facts might constitute gross negligence, and a complete bar to the action for common-law negligence, but that it was not such a bar to the statutory action. Now, it is true that it has several times been decided by the supreme court of Tennessee that the precautions enjoined by the statute upon railway companies are only such precautions as the rules of common-law negligence would require them to observe. Horne v. Railroad Co., 1 Cold. 72–76; Railroad Co. v. Pratt, 85 Tenn. 9–14, 1 S. W.

618. But it is apparent that, while the precautions to be taken are those which the common law would enjoin, the liabilities incurred for not taking them are quite different. Thus it has been held by the supreme court of the state that, if an accident occurs, a liability to the injured person is imposed upon the railway company for failure to comply with the statutory precautions, even if such failure did not cause the accident. Railroad Co. v. Walker, 11 Heisk. 383; Railroad Co. v. Burke, 6 Cold. 45. In the last case the sections of the statute we have been considering received a full construction by the supreme court of the state, which construction has never since been departed from. The court said:

"The railroad company is responsible for the damages occasioned by or resulting from the accident or collision, unless it shows that the precautions prescribed by these sections were performed, and although it may appear that the accident or collision would have occurred had the precaution been performed. Cases of hardship and absurdity may occur upon such construction of the clauses of the Code, but the language is explicit and certain, and the construction is inevitable. These sections are not invalid for want of constitutional or sovereign power in the legislature to enact the law expressed by them. The statute is founded on a policy of double aspect,—one to guard and protect the safety of the general public, and the other to compensate the injured person,—which has sanction in what is called the police power of the government. Corporate bodies are subject, as natural persons, to general laws enacted to protect and promote the quiet, comfort, health, and safety of the people, unless exempt by reason of plain implication from the nature of the privileges or franchises granted by their charter. In the absence of such exemptions, railroad corporations are subject, as would be natural persons in like occupation, to laws prescribing extraordinary vigilance, skill, exertions, and other precautions to be observed by their servants or agents in the running of trains, for the purpose of preventing accidents or collisions, and subjecting their companies to damages occasioned by or resulting from any accident or collision, unless they show that the prescribed precautions were performed. * * * Generally the negligence of a person injured by collision upon the track is not a bar to an action by him for damages, unless the railroad company show by proof that all the precautions prescribed by the Code were performed to prevent the accident. A person injured by a collision or accident caused by his own willful act cannot, by virtue of the sections 1166, 1167 [now 1298, 1299], etc., maintain an action for damages done him, occasioned by or resulting from the collision or accident. * * * Negligence of the person injured, which caused or contributed to cause the accident or collision, or without which the accident or collision would not have occurred, may be taken into consideration by the jury in determining the amount of damages proper to be given for the injury. Such construction the clause of the Code will bear, and must be given."

In Railroad Co. v. Gardner, 1 Lea, 688, referring to the subsections of 1298 and to 1299 above quoted, Judge Freeman says: "It was intended to enforce the strict performance of these duties by fixing arbitrarily upon the company a liability in case of their neglect."

It is sufficiently apparent from the statute and its construction by the court, whose construction of it is authoritative, that the statute is penal in character, and that the ordinary rules which obtain in common-law negligence cases have no application to the defenses which may be set up to actions brought in accordance with its provisions. The cardinal principle in negligence cases at common law is that no recovery can be had unless the negligence complained of causes the injury. As we have seen, to justify a recovery under the

statute there need be no causal relation whatever between the failure of the company to take the precautions required and the injury. All that is required is that the injury be caused by a collision or accident happening at the time when the precautions should have been, but were not, observed. In this construction of the statute it may be a little difficult to understand how the supreme court of Tennessee could, by reason of the contributory negligence of the sufferer, logically mitigate the damages to be recovered by him when the statute in terms gives to the person injured all the damages suffered by him. But the supreme court of Tennessee have thus mitigated the severity of the statute by construction, and it is not for us to question the power or propriety of doing so. The construction has prevailed for 25 years without disturbance by the legislature, and is a part of the law of the state as much as if expressly incorporated in the statutes.

That federal courts will always follow the construction given by the state supreme courts to the statutes of their respective states is too well settled to need discussion. Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10; Bucher v. Railroad Co., 125 U. S. 555, 8 Sup. Ct. 974. The last case is a much stronger one than the one at bar. There the question was whether a passenger upon a railroad could be prevented from recovering damages for an injury occasioned by the negligence of the company by reason of the fact that when injured he was traveling in violation of the Lord's day act of Massachusetts. Under a similar statute passed by the state of Maryland, the supreme court of the United States, in Philadelphia, W. & B. R. Co. v. Philadelphia, etc., Towboat Co., 23 How. 209, had decided that it was no defense, in a suit brought by the owners of a vessel against a railway company for an injury caused by collision with piles negligently left by the railway company concealed in navigable waters, that the injury occurred when the vessel was violating the Sunday law of the state of Maryland. Nevertheless, in view of the fact that by repeated decisions, and for a number of years, the supreme judicial court of Massachusetts had held that one receiving an injury while engaged in violation of the Lord's day act could maintain no action for damages therefor, the supreme court of the United States held that in administering the common law of Massachusetts with reference to the effect of the Lord's day act it would follow those decisions, and reach a result contrary to its own opinion as expressed in the previous Maryland case. It is to be observed that the main question at issue in the Bucher Case was not that of the construction of the Lord's day act of Massachusetts, for that needed no construction. It merely imposed a penalty for traveling on Sunday. The question was one of the common law, namely, what effect should it have upon the right of one injured by the tort of another that the injured person at the time of the injury was committing a misdemeanor? If, on such a question, decisions of the state courts become rules of decision for the federal courts, then clearly 25 years of repeated decisions by the supreme court of Tennessee as to the effect of the defense of contributory negligence to statutory ac-

tions, based on the language of the statute giving the right of action, must furnish the sole guide to federal courts in hearing and deciding such causes. See Railroad Co. v. Roberson (decided by this court at this same session) 61 Fed. 592.

It is quite true that the use of contributory negligence to mitigate the damages recoverable under these statutes was probably adopted by analogy to the somewhat peculiar rule of the Tennessee courts in cases of common-law negligence. In Railroad Co. v. Fleming, 14 Lea, 128, Judge Cooper explains the position of the Tennessee courts on contributory negligence as follows:

"The intrinsic difficulty of the subject on contributory negligence has led to three distinct lines of decisions. In England and a majority of the states of the Union the negligence of the plaintiff which contributes to the injury is held to be an absolute bar to the action. In the states of Illinois and Georgia the doctrine of comparative negligence has been adopted; that is, if, on comparing the negligence of the plaintiff with that of the defendant, the former is found to be slight and the latter gross, the plaintiff may recover. In this state we hold that, although the injured party may contribute to the injury by his own carelessness or wrongful conduct, yet, if the act or negligence of the party inflicting the injury was the proximate cause of the injury, the latter will be liable in damages, the negligence or wrongful conduct of the party injured being taken into consideration, by way of mitigation, in estimating the damages. In other words, if defendant was guilty of a wrong by which plaintiff is injured, and plaintiff was also in some degree negligent, or contributed to the injury, it should go in mitigation of damages, but cannot justify or excuse the wrong. Railroad Co. v. Fain, 12 Lea, 35. At the same time we hold that if a party, by his own gross negligence, bring an injury upon himself, or proximately contribute to such injury, he cannot recover; neither can he recover in cases of mutual negligence."

But certainly this principle with reference to contributory negligence which prevails in the courts of Tennessee has not been applied to the statutes which we are discussing as it would be applied to cases of common-law negligence, because, if so, then, under the distinction referred to by Judge Cooper in Fleming's Case, the gross contributory negligence of the plaintiff, if the proximate cause of the injury, would entirely defeat the action under the statute. This it has been held not to do, because of the imperative language of the statute. We are thus brought back to the proposition that the rule of law in Tennessee which prevents the defense of contributory negligence from being a complete bar to the action under the statute grows out of the language of the statute itself, and the construction of that language by the supreme court of Tennessee. Therefore it follows that the duty of the trial judge in the court below was to follow the decisions of the state court with reference to the defenses under this statute, and that the gross negligence of Nason was not a complete bar to the action, but should have been considered by the jury in mitigation of damages.

The supreme court of Tennessee have been very stringent in requiring that trial judges should instruct the jury, in cases under this statute, that they must reduce damages for contributory negligence. Railroad Co. v. Nowlin, 1 Lea, 523. In this case, should the same facts appear, the court should tell the jury that on the undisputed facts the deceased was guilty of gross contributory negli-

gence, and that, if they should find the company had sustained the burden of showing that the bell was ringing as the engine approached and made the crossing, plaintiff could not recover, however negligent, in other respects, the bridge company might have been. The court should also say to the jury that they must, if they find that the bell was not rung, reduce the damages to be awarded the plaintiff by reason of his intestate's gross negligence, and that, if the jury should see fit, they may carry the reduction to the extent of making the damages merely nominal. In several cases, the supreme court of Tennessee have sustained verdicts in suits under this statute, where contributory negligence was shown, in sums which were little more than nominal. Of course, if Nason's death was the result of his own willful act, which some of the evidence tended to show, no recovery could be had, under the case of Railroad Co. v. Burke, 6 Cold. 45, already cited, and that question should also be left to the jury.

For the reasons given, the judgment of the court below is reversed as to the bridge company, and a new trial ordered against that defendant.

As already stated, the judgment in favor of the Kansas City, Ft. Scott & Memphis Railroad Company is affirmed.